UNITED STATES DISTRICT COURT
District of District of Columbia
-------------------------------------------------------
                                              :
CLOUD FOUNDATION, INC. *et. al.*              :
                                              :     CASE NO. 1:09-CV-01651
           Plaintiff,                         :
                                              :
vs.                                           :     OPINION & ORDER
                                              :     [Resolving Doc. Nos. 72 and 76]
KEN SALAZAR, *et. al.*                        :
                                              :
           Defendant.                         :
                                              :
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

In this challenge to federal management of wild horses on the Pryor Mountain Wild Horse Range in southern Montana and northern Wyoming, both parties move for summary judgment. For the reasons stated below, the Court **DENIES** Plaintiffs' motion for summary judgment and **GRANTS** Defendants' cross-motion for summary judgment.

**I. Background**

**A. Factual Background**

This action concerns the government's treatment of wild horse populations on the Pryor Mountain Wild Horse Range. The range spans 39,650 acres and is located in Carbona County, Montana, and Big Horn County, Wyoming.[1] The Secretary of the Interior established the range in

---

[1] BLM Doc.1, BLM-000002.

-1-

1968,[2] but the range has since been expanded to include lands within the Custer National Forest, administered by the Forest Service of the Department of Agriculture, and the Bighorn National Recreation Area, administered by the National Park Service of the Department of the Interior.[3]

In 1971, three years after the designation of the Pryor Mountain Wild Horse Range, Congress passed the Wild Free Roaming Horses and Burros Act ("Wild Horses Act"). The Wild Horses Act tasked the Bureau of Land Management ("BLM") in the Department of the Interior and the Forest Service in the Department of Agriculture to care for and manage wild horses on lands in their respective jurisdictions.[4]

In 1984, the BLM issued a herd management area plan ("HMAP") establishing an appropriate management level ("AML") at 121 wild horses (plus or minus five percent).[5] In 1992, the BLM modified the 1984 HMAP and established an AML of 95 (plus or minus 10 percent) or 85 to 105 wild horses.[6] The 1992 HMAP governed wild horse management until 2009.

In 2008, BLM, with the assistance of the Forest Service and the National Park Service, evaluated the range to determine if management objectives were being met.[7] The evaluation found that, as a result of grazing and drought, certain areas of the range were overused.[8] As a result, the evaluation recommended BLM manage the range for 92 to 117 horses.[9]

Afterwards, BLM, with the assistance of Forest Service and the National Park Service,

---

[2] *Id.*
[3] *Id.*
[4] 16 U.S.C. §§ 1332, 1333.
[5] BLM Doc.1, BLM-000002.
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.*

Case No. 1:09-CV-01651
Gwin, J.

prepared a draft HMAP and preliminary environmental assessment, which proposed to increase the AML to 90 to 120 horses.[10] BLM afforded the public 30 days to submit comments, relevant information, and recommendations.[11]

After reviewing public comments, the BLM and the Forest Service issued the Pryor Mountain Wild Horse Range Herd Management Area Plan and Environmental Assessment ("2009 HMAP").[12] Among other things, the 2009 HMAP established an AML of 90-120 horses and provided for the repair, maintenance, and slight extension of the northern boundary fence.[13]

Plaintiffs appealed the BLM's 2009 HMAP decision to the Interior Board of Land Appeals ("IBLA")[14] as well as to the United States Forest Service.[15]

**B. Procedural Background**

On August 28, 2009, Plaintiffs filed a Complaint for Declaratory and Injunctive Relief challenging BLM's early September planned gather of wild horses on the range.[16] On August 31, 2009, Plaintiffs moved for a temporary restraining order to enjoin the gather.[17] On September 2, 2009, the Court denied the motion.[18] On September 8, 2009, the planned gather concluded.[19]

On August 25, 2010, Plaintiffs filed their Second Amended Complaint.[20] On October 21,

---

[10] *Id.* at BLM-000003.
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] BLM Doc. 9.
[15] FS-E1.
[16] Doc. 1.
[17] Doc. 3.
[18] Doc. 12.
[19] Doc. 16-2.
[20] Doc. 36.

-3-

2010, the government moved for partial judgment on the Plaintiffs' Second Amended Complaint. The government alternatively asked to transfer the case to the U.S. District Court for the District of Montana.[21] The Court denied both motions.[22]

On May 27, 2011, Plaintiffs filed a motion for summary judgment.[23] On July 1, 2011, Defendants filed a cross-motion for summary judgment.[24]

## II. Legal Standards

**A. Summary Judgment**

Under Federal Rule of Civil Procedure 56, we must grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[25] Once the moving party has done so, the non-moving party must set forth facts in the record—not its allegations or denials in pleadings—showing a triable issue.[26] The existence of some doubt as to the material facts is insufficient to defeat a motion for summary judgment.[27] However, the Court will view the facts and all reasonable inferences from those facts in favor of the non-moving party.[28]

---

[21] Doc. 46.
[22] Doc. 53.
[23] Doc. 72.
[24] Doc. 76.
[25] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).
[26] *See* Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).
[27] *Matsushita*, 575 U.S. at 586.
[28] *Thomas v. Cohen*, 453 F.3d 657, 600 (6th Cir. 2004).

Case No. 1:09-CV-01651
Gwin, J.

**B. Agency Action**

Plaintiffs challenge actions taken by the BLM and the Forest Service under the Wild Horses Act and the National Environmental Policy Act. Because neither statute creates a private right of action, this Court conducts review of agency compliance under the Administrative Procedure Act ("APA").[29]

Under the APA, "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."[30] A court may set aside final agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[31]

Review under the arbitrary and capricious standard is "narrow," and the court must not "substitute its judgment for that of the agency."[32] Reviewing courts must be "extremely deferential" when the agency is making predictions within the agency's area of special expertise.[33] An agency rule is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[34]

---

[29] *Theodore Roosevelt Conservation Partnership v. Salazar ("TRCP ")*, 616 F.3d 497, 507–08 (D.C.Cir.2010).
[30] 5 U.S.C. § 704.
[31] 5 U.S.C. §706(2)(A).
[32] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 2866, 77 L. Ed. 2d 443 (1983).
[33] *Nuclear Energy Inst., Inc. v. Envtl. Prot. Agency*, 373 F.3d 1251, 1289 (D.C. Cir. 2004).
[34] *State Farm*, 463 U.S. 29, 43 (1983).

Case No. 1:09-CV-01651
Gwin, J.

## III. Analysis

**A. Wild Horse Act Claims**

**1. Final Agency Action**

Defendants say the Court should give judgment to the BLM on Plaintiffs' Wild Horses Act claims. In support of this, Defendant BLM argues that Plaintiffs do not challenge any "final agency action."[35] Defendants say the final agency action in the current case is the IBLA decision, not the 2009 HMAP decision, and Plaintiffs have only asserted various challenges to the 2009 HMAP.[36] In response, Plaintiffs say the 2009 HMAP is a sufficient final agency action because Plaintiffs were not required to appeal to the Interior Board of Land Appeals.[37]

Under the APA, "[a]gency action[s] made reviewable by statute and final agency actions[s] for which there is no other adequate remedy in a court are subject to judicial review."[38] The BLM is part of the Department of the Interior. The Department of the Interior regulations states that IBLA decisions are final agency actions. "The Board [of Land Appeals] decides finally for the Department [of Interior] appeals to the head of the Department from decisions rendered by Departmental officials relating to . . . [t]he use and disposition of public lands . . . "[39] "A decision of the Board shall constitute final agency action and be effective upon the date of issuance, unless the decision itself provides otherwise."[40]

---

[35] Doc. 76-1 at 19.
[36] *Id.* at 20.
[37] Doc. 77 at 3.
[38] 5 U.S.C. § 704.
[39] 43 C.F.R. § 4.1(b)(3)(i).
[40] 43 C.F.R. § 4.403.

Case No. 1:09-CV-01651
Gwin, J.

The Court finds that the IBLA decision is the final administrative action, not the 2009 HMAP. Although Plaintiffs say no statute or rule required Plaintiffs to appeal the 2009 HMAP to the IBLA, an optional appeal of a resulting determination to an appellate administrative body renders the initial administrator's decision nonfinal for judicial review under the APA.[41] Thus, Plaintiffs should have challenged the IBLA decision as the final agency action in the current case. However, the Court denies the Plaintiffs request for leave to amend their Second Amended Complaint to challenge the IBLA decision[42] because amendment would be futile. Even if Plaintiffs did challenge the IBLA decision, they would not survive summary judgment for the below reasons.

**2. Range Expansion Claim**

Defendants say Plaintiffs failed to exhaust their administrative remedies by not raising their range expansion claim in their IBLA and United States Forest Service appeals.[43] We require parties to exhaust their administrative remedies before seeking relief from federal courts.[44] Exhaustion protects administrative agency authority and promotes judicial efficiency.[45] Regulations of the Department of the Interior require plaintiffs to exhaust their administrative remedies by petitioning the BLM and appealing its decision to the IBLA.[46] Similarly, the federal statute and regulations of

---

[41] *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1064 (9th Cir. 2010) (quoting *Acura of Bellevue v. Reich*, 90 F.3d 1403, 1407 (9th Cir.1996))(noting ; *Oregon Natural Desert Ass'n v. McDaniel*, 751 F. Supp. 2d 1145, 1151 (D. Or. 2010) (noting the IBLA merits decision became the final agency action and rendered the underlying BLM decision non-final).

[42] Doc. 76-1 at 5 n. 2.

[43] Doc. 76-1 at 20.

[44] *Mobile Exploration & Producing U.S., Inc. v. Babbitt*, 913 F. Supp. 5, 10 (D.D.C. 1995) (citing *McCarthy v. Madigan*, 503 U.S. 140, 145, 112 S. Ct. 1081, 1086, 117 L. Ed. 2d 291 (1992)).

[45] *Id.*

[46] 43 C.F.R. § 4.410.

the Department of Agriculture require plaintiffs to exhaust their administrative remedies.[47]

The Court finds that Plaintiffs sufficiently exhausted their administrative remedies as to their range expansion argument. In both the IBLA and United States Forest Service administrative appeal process, the Plaintiffs said that the 2009 HMAP wrongly failed to consider range expansion onto Forest Service lands outside the boundary of the range and said the failure to expand the range violated the Wild Horses Act.

Specifically, in the administrative hearings, Plaintiffs stated that the BLM and Forest Service failure to consider expanding the range into National Forest violated "[the National Environmental Policy Act] NEPA, BLM's own statutory mandate under [the Wild Free-Roaming Horse and Burros Act] 16 U.S.C. § 1331(a) ("... all management activities shall be at the minimal feasible level ...") and BLM's corresponding regulation at 43 C.F.R. §4710.4 (" . . . Management shall be at the minimum level necessary to obtain the objectives in approved land use plans and herd management area plans.")."[48] Plaintiffs sufficiently exhausted their administrative remedies.

Although Plaintiffs preserved the right to challenge the failure to expand the range, Court finds the 2009 HMAP's decision not to expand the range was not arbitrary and capricious. Range expansion is not the type of decision that can be made in a HMAP. Rather, as the Forest Service explained, "[d]esignation of a wild horse territory *is* a 'land use' decision, appropriately addressed at the Forest Plan scale, rather than the scale for the HMAP revision."[49] In fact, the Plaintiffs took

---

[47] 36 C.F.R. §§ 215.14.
[48] FS-E1, FS-001939; BLM Doc. 10, BLM-000240.
[49] FS E13, FS-002022.

Case No. 1:09-CV-01651
Gwin, J.

this in both their Forest Service and BLM appeals.[50] Range expansion onto National Forest System lands raises numerous conflicts with other Forest Plan management goals. The Forest Service must also consider the ecological integrity of the Lost Water Canyon Research National Area and Lost Water Canyon Recommended Wilderness and must consider competition for forage between wild horses and other livestock.[51] The Forest Service needed to balance competing goals. With these competing interests, the Forest Service's 2009 HMAP decision not to expand the range was not arbitrary and capricious.

**3. 2009 HMAP AML**

Plaintiffs say the 2009 HMAP did not establish a horse level population that could ensure genetic viability.[52] BLM officials receive significant discretion to choose the wild horse and burro populations the range can support.[53] This BLM discretion extends to choosing the target wild horse and burro populations.[54]

Here, in the 2009 HMAP, the BLM set the target horse and burro population at 90-120. In setting this target population, the BLM considered "genetic diversity and other aspects of the health of the wild horse population."[55] The BLM also agreed that it would manage the population to preserve genetic traits, blood lines and ensure maximum genetic variation within a small population

---

[50] FS E1, FS-001927; BLM Doc. 9, BLM-000184.
[51] FS A1, FS-000022; *See also* FS E13, FS-002022 (discussing potential conflicts with range expansion).
[52] Doc. 72-1 at 26.
[53] *In Def. of Animals v. U.S. Dep't of Interior*, 909 F. Supp. 2d 1178, 1191 (E.D. Cal. 2012) (stating "BLM has considerable discretion on how to carry out the directives of the Act"); *Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1318 (D.C. Cir. 1982) (stating "BLM's finding of wild horse overpopulations should not be overturned quickly"); *Am. Horse Prot. Ass'n v. Frizzell*, 403 F.Supp. 1206, 1217 (D.Nev.1975) (stating BLM must be afforded a "high degree of discretionary authority" in managing herds).
[54] *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 16 (D.C. Cir. 2006).
[55] BLM Doc. 1, BLM-000008.

Case No. 1:09-CV-01651
Gwin, J.

while maintaining healthy rangelands.[56] Specifically, the BLM agreed the "[w]ild horses would be managed for an even sex ratio as well as age classes" and "emphasis would be placed on retention and increasing the number of 5-10 year-old animals as the core breeding population."[57] In choosing this population level, the BLM necessarily faced competing claims. Larger horse and burro levels impair the sustainable ecology for other animals. Against the competing claims for using this land, Court finds that the agency used reasoned decision making when it picked the target horse and burro population and its actions were not arbitrary and capricious.

**4. Repair, Maintenance, and Slight Extension of the Northern Boundary Fence**

Plaintiffs say the Forest Service's decision to repair, maintain, and slightly extend the Northern Boundary Fence violates the Wild Horses Act because the change to the fence reduces the movements of the wild horses to and from areas they have used historically used.[58] The Plaintiffs mostly dispute the location of the fence. The Plaintiffs' challenge to the range's boundary was already decided in *Cloud Foundation, Inc. v. Kempthorne* on statute of limitations grounds.[59] The repaired fence merely demarcates the location of the northern boundary of the range chosen in prior land use planning decisions (1984 for BLM and 1987 for Forest Service).[60]

In any event, the Court finds that the Forest Service thoroughly explained its decision to repair, maintain, and slightly extend the Northern Boundary Fence. The Forest Service determined that extending and realigning the fence would "reduce long-term maintenance needs, provide an

---

[56]*Id.*
[57]*Id.*
[58]Doc. 72-1 at 21.
[59]*The Cloud Found., Inc. v. Kempthorne*, CV 06 111 BLG RFC, 2007 WL 1876486 (D. Mont. June 27, 2007).
[60]FS E13, FS-002019.

effective barrier, and minimize conflicts with other legitimate uses on adjacent National Forest System land."[61] Further, the Forest Service found that the "proposed maintenance, minor realignment, and extension would also reduce or halt the need for handling (moving) of horses back onto the PWWHR associated with an ineffective north boundary."[62]

In addition, the Forest Service found that the fence repair and extension would have "no effect on the free roaming ability fo the herd within the territory."[63] The Forest Service found that while the fence lengthening would cut off one 25-acre parcel to the range, it would add 25 acres with the fence realignment out of the deep snow area.[64] In sum, the Forest Service fully explained the need to repair, maintain, and slightly extend the fence. Its actions were not arbitrary and capricious.

**B. National Environmental Policy Act Claims**

Plaintiffs also say Defendants ignored their National Environmental Policy Act obligations when Defendants used a categorical exclusion in disposing wild horses it removes from the Pryor Mountain Wild Horse Range.[65] A categorical exclusion is used when a government agency decides certain conduct does "not individually or cumulatively have a significant effect on the human environment."[66] Once an agency invokes a categorical exclusion, it is free from further obligations under the National Environmental Policy Act. With a categorical exclusion, neither an environmental assessment nor an environmental impact statement is required."[67]

---

[61] *Id.* at FS-002022.
[62] *Id.* at FS-002023.
[63] Id.
[64] *Id.*
[65] Doc. 36 at 22.
[66] 40 C.F.R. 1508.4.
[67] *Id.*

Case No. 1:09-CV-01651
Gwin, J.

**1. New Claims Raised in Summary Judgment Briefing**

Plaintiffs' Second Amended Complaint challenges BLM's compliance with the National Environmental Policy Act in connection with the processing and disposition of "Pryor wild horses it removes from the range."[68] Despite narrow scope of Count Two, Plaintiffs' summary judgment motion expands their claim to challenge the 2009 HMAP's compliance with the National Environmental Policy Act[69] and the disposition of wild horses removed from other federally-managed ranges.[70] Defendants are entitled to fair notice of claims advanced in litigation. New claims cannot be pled in summary judgment briefs.[71] Thus, the Courts rejects these unpled claims and only addresses the claims raised in Plaintiffs' Second Amended Complaint.

**2. Mootness**

Under the Constitution, a live controversy must exist at all stages of judicial review.[72] To the extent Plaintiffs challenge the BLM's use of a categorical exclusion for it's the 2009 gather disposition, the claim is moot. Both the gather and subsequent disposition at an adoption event are complete.[73] To the extent Plaintiffs challenge the categorical exclusion of *future* BLM horse gathers from the National Environmental Policy Act's requirements, the Court finds the challenge falls within the "capable of repetition yet evading review" exception to the mootness doctrine because it

---

[68] Doc. 36 at 22.

[69] Doc. 72-1 at 30 ("By failing to consider other alternatives that satisfy the mandates of the WFHBA, the HMAP fails to meet the minimum requirements of NEPA.")

[70] *Id.* at 29-30. ("As a matter of course, BLM applies a CE for the post-removal treatment of *all* wild horses and burros it removes from the public lands . . .").

[71] *Taylor v. Mills*, 892 F. Supp. 2d 124, 137 (D.D.C. 2012) (stating "plaintiff is not permitted to raise new claims at the summary judgment stage, where those claims were not pleaded in the complaint").

[72] U.S. Const. art. III, § 1.

[73] *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 22 (D.C. Cir. 2006) (holding that claims regarding completed gather were moot).

-12-

Case No. 1:09-CV-01651
Gwin, J.

"seeks declaratory relief as to an ongoing policy.[74/] The horse gather claim is not moot.

**3. Final Agency Action**

As explained above, under the APA, courts can only review final agency action.[75/] "Final agency actions" are actions which (1) "mark the consummation of the agency's decisionmaking process" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow."[76/]

Here, the Court finds that Plaintiff's challenge to BLM's future use of a categorical exclusion does not challenge final agency action. Plaintiffs claim amounts to a challenge to a "declaration in its Department Manual" that BLM will use categorical exclusions in future horse gathers.[77/] Rather than an action that "mark[s] the consummation of the agency's decisionmaking process,"[78/] it is a general recommendation for the agency. Any actual future decision to use a categorical exclusion will be shaped by a number of factors and circumstances unique to that specific future horse gather. In fact the BLM Manual states:

> before any action described in the following list of CXs is used, the list of "extraordinary circumstances .. must be reviewed for applicability. If a CX does not pass the "extraordinary circumstances" test, the proposed action analysis defaults to either an EA or an EIS. When no "extraordinary circumstances" apply, the following activities do not require the preparation of an EA or EIS.[79/]

Based on the foregoing, before deciding to use a categorical exclusion on future horse gathers, the

---

[74/] Doc. 35 at 6.
[75/] 5 U.S.C. § 704.
[76/] *Bennett v. Spear*, 520 U.S. 154, 178 (1997).
[77/] Doc. 72-1 at 32.
[78/] *Id.*
[79/] BLM Doc. 73, BLM-004269.

BLM will consider a variety of ecological factors. Only after reviewing BLM's reasoning behind an invocation of a categorical exclusion can a court determine if a violation of the National Environmental Policy Act has occurred. Therefore, Plaintiffs have not challenged final agency action.

### IV. Conclusion

For the reasons stated above, the Court **DENIES** Plaintiffs' motion for summary judgment and **GRANTS** Defendants' cross-motion for summary judgment.

IT IS SO ORDERED.

Dated: November 19, 2013          s/ *James S. Gwin*
                                                             JAMES S. GWIN
                                                              UNITED STATES DISTRICT JUDGE